Leonard D. DuBoff, OSB #774378
Edward T. Fu, OSB #113899
E-mail: lduboff@dubofflaw.com
THE DUBOFF LAW GROUP, PC
6665 SW Hampton Street, Suite 200
Portland, Oregon 97223-8357
Telephone: 503.968.8111
Facsimile: 503.968.7228
Attorney for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| MARK MOORE, an individual<br><br>Plaintiff,<br><br>     v.<br><br>SPECIALIZED LOAN SERVICING, LLC; WF VICTORIA GRANTOR TRUST 2016-3; WATERFALL ASSET MANAGEMENT, LLC; U.S. BANK TRUST, N.A.<br><br>Defendants. | Case No.<br><br>COMPLAINT<br>(Breach of Covenant of Good Faith and Fair Dealing; Intentional Interference with Prospective Economic Relations)<br><br>DEMAND FOR JURY TRIAL |

Plaintiff MARK MOORE ("Plaintiff"), by and through his counsel, Leonard D. DuBoff and Edward T. Fu of The DuBoff Law Group, PC, hereby alleges the following against defendants SPECIALIZED LOAN SERVICING, LLC; WF VICTORIA GRANTOR TRUST 2016-3; WATERFALL ASSET MANAGEMENT, LLC; and U.S. BANK TRUST, N.A. (collectively "Defendants"):

COMPLAINT – Page 1

## PARTIES

1.

Plaintiff MARK MOORE, an individual, is and at all material times herein was a resident and domiciliary of Washington County, State of Oregon.

2.

Defendant SPECIALIZED LOAN SERVICING, LLC ("SLS") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 8742 Lucent Boulevard, Highlands Ranch, Colorado, 80129.

3.

Defendant WF VICTORIA GRANTOR TRUST 2016-3 ("WF VICTORIA") is a statutory trust organized and existing under the laws of the State of Delaware.

4.

Defendant WATERFALL ASSET MANAGEMENT, LLC ("WATERFALL") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 1251 6th Avenue, 50th Floor, New York, NY 10020. On information and belief, Defendant WATERFALL is the owner and trustee of Defendant WF VICTORIA and is tasked to carry out functions on behalf of Defendant WF VICTORIA within the scope of the powers granted to it under contractual agreements executed between Defendants WATERFALL and WF VICTORIA.

5.

Defendant U.S. BANK TRUST, N.A. ("U.S. BANK") is a foreign business corporation organized and existing under the laws of the State of Delaware. On information and belief, Defendant U.S. BANK is a trustee of Defendant WF VICTORIA and is tasked to carry out

The DuBoff Law Group, PC
6665 SW Hampton Street, Suite 200
Portland, Oregon 97223-8357
Telephone (503) 968-8111
Facsimile (503) 968-7228

functions on behalf of Defendant WF VICTORIA within the scope of the powers granted to it under contractual agreements executed between Defendants U.S. BANK and WF VICTORIA.

## JURISDICTION AND VENUE

6.

This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a). No defendant is a resident of the same state as Plaintiff and the amount in controversy exceeds $75,000.

7.

This Court has personal jurisdiction over the Defendants because the Defendants transact business in this District.

8.

Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

## FACTS COMMON TO ALL CLAIMS

9.

On or about May 19, 2007, Plaintiff executed a Home Equity Line of Credit Agreement (the "HELOC agreement") with Discover Bank. To secure the loan, Plaintiff simultaneously executed a deed of trust (the "Trust Deed") on his residence at 15960 SW Cardinal Loop, Beaverton, Oregon (the "Residence") for the benefit of Discover Bank. On information and belief, the Trust Deed was duly recorded in the property records of Washington County, Oregon on May 30, 2007. This Trust Deed was junior to an existing senior mortgage on the Residence. Copies of the HELOC agreement and Plaintiff's unrecorded copy of the Trust Deed are attached as Exhibits 1 and 2, respectively.

COMPLAINT – Page 3

10.

The HELOC agreement provided Plaintiff with a credit limit of $250,000. Notably, the HELOC agreement also provided that the draw period during which Plaintiff could access the credit ended on the maturity date of May 19, 2017 (the "Maturity Date") but did not provide for a separate repayment period. Instead, the HELOC agreement contained an acceleration clause that made the entire loan balance immediately due on the Maturity Date. However, it stated that the lender had the discretion to extend the period to make payment. The HELOC agreement also included an attorney fees provision.

11.

On or about September 24, 2016, Plaintiff received notice that the HELOC agreement and Trust Deed had been assigned to Defendant WF VICTORIA and would be serviced by Defendant SLS.

12.

In approximately March 2017, Plaintiff was made aware that the HELOC agreement did not contain a separate repayment period and that the entire balance owed was due on the Maturity Date. Plaintiff immediately began to make arrangements to refinance both the HELOC and the senior mortgage.

13.

As of March 2017, Plaintiff's balance on the HELOC was approximately $225,000. He had been making regular monthly payments of approximately $650.

14.

On or about April 18, 2017, Plaintiff submitted a Request for Mortgage Assistance ("RMA") to Defendant SLS requesting additional time to pay off the HELOC in the event Plaintiff

COMPLAINT – Page 4

was unable to obtain refinancing by the Maturity Date. When Plaintiff did not receive any response, he submitted another RMA. Plaintiff eventually submitted a total of four RMAs before the Maturity Date of May 19, 2017, but did not obtain relief of any kind because Defendant SLS informed him that the investor that owned the loan did not participate in the relief program.

15.

Plaintiff provided regular telephone updates to Defendant SLS while he continued his refinancing efforts. During one such phone call with Defendant SLS, Plaintiff was informed by the representative that Defendant SLS would not report any delinquencies on the HELOC to outside parties until the delinquencies were over 90 days old. Defendant understood this to mean that he would have up to 90 days after the Maturity Date to obtain refinancing without the outstanding HELOC balance adversely affecting his credit.

16.

Plaintiff was unable to complete refinancing of the HELOC by the Maturity Date on May 19, 2017. However, Plaintiff submitted two payments to Defendant SLS after the Maturity Date had passed: one via electronic payment on May 22, 2017, for $1,200 and another via check on June 20, 2017, for $1,000. The electronic payment was received and processed by Defendant SLS, but the check payment was never deposited.

17.

By July 2017, Plaintiff had obtained preliminary approval for approximately $500,000 in financing from Mortgage Express. This new loan would refinance both the senior mortgage and the HELOC at a lower interest rate. In order to close the refinancing, Mortgage Express needed only to obtain a verification of Plaintiff's HELOC from Defendant SLS, after which the loan could close within four to six days. Defendant SLS provided a Verification of Mortgage to Mortgage Express on August 18, 2017, which stated that Plaintiff had been delinquent zero times in both the

COMPLAINT – Page 5

present and preceding year. Immediately below that statement, however, the Verification of Mortgage contained the following contradictory statement: "Days Delinquent excluding Grace days: 70." After reviewing the Verification of Mortgage, a representative from Mortgage Express informed Plaintiff that she had never seen a Verification of Mortgage that said payment history was perfect yet delinquent. A copy of the Verification of Mortgage is attached to this complaint as Exhibit 3.

18.

Because of the contradictory information contained in the Verification of Mortgage, Mortgage Express immediately requested a "no score" credit report for Plaintiff. If the credit report were satisfactory, the refinancing could be completed as scheduled. When Mortgage Express obtained the no-score credit report, it showed that Defendant SLS had reported Plaintiff as being 60 days late on his HELOC agreement payments. This was contrary to the assurance Defendant SLS had previously provided Plaintiff that delinquencies would not be reported for 90 days.

19.

In a continued effort to clarify Plaintiff's payment status under the HELOC agreement, Mortgage Express immediately requested that Defendant SLS provide a letter stating that Plaintiff had never made any late HELOC agreement payments.

20.

After two weeks with no response from Defendant SLS, Mortgage Express followed up with a phone call to Defendant SLS on August 31, 2017, regarding the requested letter. In response, Defendant SLS faxed Mortgage Express a letter confirming that all payments made by Plaintiff from June 2014 until the Maturity Date in May 2017 were on time. However, the letter then contained the following statement: "Delinquency on this loan did not occur until the loan reached

COMPLAINT – Page 6

the Maturity Date in which the balance was due in full." A copy of the August 31, 2017, letter from Defendant SLS is attached to this complaint as Exhibit 4.

21.

In an effort to reconcile the contradictory information it had been provided, Mortgage Express then requested that Defendant SLS provide an additional letter stating that Defendant SLS would not accept partial payments after the Maturity Date. Had Defendant SLS provided this letter, Mortgage Express would have been able to close the new loan within four to six days. However, Defendant SLS refused to provide the requested letter.

22.

Had Defendant SLS provided the required documents for Plaintiff's refinancing to close by September 8, 2017, the full payoff amount of the HELOC would have been $227,099.73. A copy of the Payoff Statement dated August 9, 2017 with payoff figures valid through September 8, 2017, is attached as Exhibit 5.

23.

On or about August 31, 2017, Plaintiff placed a call to Defendant WATERFALL to discuss his loan and was directed to Traci Newman. Ms. Newman asked Plaintiff to provide any documentation concerning his loan so she could forward it to Defendant SLS.

24.

Plaintiff provided the requested documentation as well as a summary and timeline of events to Ms. Newman via e-mail and telephone on September 1, 2017. However, he did not hear from Ms. Newman or Defendant WATERFALL again. There was also no appreciable change in Defendant SLS's actions after Plaintiff's last communication to Ms. Newman.

COMPLAINT – Page 7

25.

As a result of Defendant SLS's contradictory statements regarding the status of Plaintiff's delinquency, Mortgage Express was prohibited by federal law from providing conventional mortgage financing to Plaintiff.

26.

By that time, Defendant SLS had also reported a delinquency of over 90 days to credit reporting agencies. Plaintiff was therefore also unable to obtain conventional financing from alternative lenders for the same reason.

27.

On or about October 5, 2017, Defendant SLS provided Plaintiff with a copy of a valuation report for the Residence that had been prepared in response to one of his prior RMAs. The report valued the property from $625,000 to $658,000. Encumbrances on the Residence were approximately $500,000, resulting in an estimated equity of approximately $125,000 to $168,000.

28.

On or about January 31, 2018, Plaintiff received a Notice of Default and Notice of Intent to Foreclose from Defendant SLS.

29.

On February 24, 2018, Plaintiff submitted a response to the Notice of Default and Notice of Intent to Foreclose requesting temporary relief in lieu of foreclosure.

30.

Due to Defendants' refusal to provide any mortgage relief whatsoever, Plaintiff and Defendant SLS entered the pre-foreclosure mediation process as required under Oregon law. During a conversation with Defendant SLS's foreclosure counsel as part of this process in early

The DuBoff Law Group, PC
6665 SW Hampton Street, Suite 200
Portland, Oregon 97223-8357
Telephone (503) 968-8111
Facsimile (503) 968-7228

November 2018, Plaintiff was informed that the attorney had been specifically instructed to pursue foreclosure on Plaintiff's Residence.

31.

Based on this conversation with Defendant SLS's foreclosure attorney, Plaintiff concluded that further attempts to negotiate with Defendant SLS would be futile. As a result, Plaintiff liquidated his retirement accounts, including an annuity, and paid the HELOC off in full on November 14, 2018, in order to avoid foreclosure and keep his Residence. The final payoff amount was $237,133.74. The Deed of Reconveyance to release the Trust Deed was recorded in the property records of Washington County on November 28, 2018. A copy of Plaintiff's wire transfer request to pay off the HELOC in full is attached as Exhibit 6.

32.

As a result of the liquidation of his retirement accounts, Plaintiff was required to pay a 10% penalty to the Internal Revenue Service because he had not yet reached the age of 59 ½ years. The withdrawal of funds also significantly increased Plaintiff's taxable income for the year, thereby putting him into a higher tax bracket and causing him to pay a higher marginal tax rate.

33.

Plaintiff was not able to complete the refinancing of the senior mortgage on the Residence until early 2020. As a result, Plaintiff was required to make the higher mortgage payments on the original senior mortgage for an additional three years.

## FIRST CLAIM FOR RELIEF

### (Breach of Contractual Duty of Good Faith and Fair Dealing)

34.

Plaintiff realleges Paragraphs 1-33 as if fully stated herein.

COMPLAINT – Page 9

35.

Defendant WF VICTORIA agreed to act in good faith and deal fairly with Plaintiff when it received the assignment of the HELOC agreement and the associated Trust Deed.

36.

Defendant WATERFALL, as Defendant WF VICTORIA's owner or trustee with the right of control at all material times, was obligated to compel Defendant WF VICTORIA to act in good faith and deal fairly with Plaintiff in accordance with the HELOC agreement.

37.

Defendant SLS, as loan servicer for Defendants WF VICTORIA and WATERFALL's, acted as an agent on behalf of Defendants WF VICTORIA and WATERFALL at all material times.

38.

Defendants WF VICTORIA and WATERFALL breached the implied covenant of good faith and fair dealing by virtue of the actions of their agent Defendant SLS in obstructing Plaintiff's efforts to refinance the HELOC by reporting a delinquency before the delinquency was 90 days old, in issuing multiple written statements that described Plaintiff's payment history in contradictory terms, in refusing to issue a letter stating that Defendant SLS would not accept late partial payments, and in failing to exercise its discretion to extend the repayment period.

39.

Defendants WATERFALL and WF VICTORIA further breached the implied covenant of good faith and fair dealing by failing to instruct Defendant SLS to cease its obstruction of Plaintiff's efforts to refinance the HELOC in the manner described above.

COMPLAINT – Page 10

40.

The actions of Defendants WATERFALL and WF VICTORIA, and of their agent Defendant SLS in violation of the implied covenant of good faith and fair dealing injured Plaintiff's right to receive the benefit of the HELOC agreement.

41.

As a direct and proximate result of the breach by Defendants WATERFALL and WF VICTORIA of the covenant of good faith and fair dealing implied in the HELOC agreement, Plaintiff has suffered damages in excess of $235,534.01. Such damages include $10,034.01 in additional interest and penalties paid by Plaintiff on the HELOC agreement due to the payoff being delayed from September 8, 2017 until November 14, 2018, the difference between the interest Plaintiff would have paid on the refinanced loan and the amount actually paid by Plaintiff on the senior mortgage from September 2017 through January 2020, in excess of $130,000 in taxes and penalties resulting from the liquidation of Plaintiff's retirement accounts, in excess of $43,000 of lost investment appreciation to date and future tax-deferred income resulting from the liquidation of Plaintiff's retirement accounts, an amount to be determined in lost vested guaranteed lifetime income benefits from a liquidated annuity, approximately $2,500 in surrender fees for liquidating Plaintiff's annuity, and an estimated $50,000 legal costs incurred in re-funding Plaintiff's retirement accounts.

42.

As a further direct and proximate result of Defendants WATERFALL and WF VICTORIA's breach of the covenant of good faith and fair dealing implied in the HELOC agreement, Plaintiff has been required to hire an attorney to represent him in this matter and seeks an award of his attorneys' fees and costs.

COMPLAINT – Page 11

## SECOND CLAIM FOR RELIEF

### (Intentional Interference with Prospective Economic Relations)

43.

Plaintiff realleges Paragraphs 1-42 as if fully stated herein.

44.

Defendants SLS, WF VICTORIA, WATERFALL, and U.S. BANK TRUST, N.A., by their actions, have interfered with Plaintiff's prospective economic relationship with Mortgage Express.

45.

With knowledge of the prospective economic relationship between Plaintiff and Mortgage Express, Defendants have intentionally, wrongfully, and maliciously interfered with the same.

46.

As a direct and proximate result of the aforesaid conduct of Defendants, Plaintiff has suffered damages in excess of $235,534.01. Such damages include $10,034.01 in additional interest and penalties paid by Plaintiff on the HELOC agreement due to the payoff being delayed from September 8, 2017 until November 14, 2018, the difference between the interest Plaintiff would have paid on the refinanced loan and the amount actually paid by Plaintiff on the senior mortgage from September 2017 through January 2020, in excess of $130,000 in taxes and penalties resulting from the liquidation of Plaintiff's retirement accounts, in excess of $43,000 of lost investment appreciation to date and future tax-deferred income resulting from the liquidation of Plaintiff's retirement accounts, an amount to be determined in lost vested guaranteed lifetime income benefits from a liquidated annuity, approximately $2,500 in surrender fees for liquidating Plaintiff's annuity, and an estimated $50,000 legal costs incurred in re-funding Plaintiff's retirement accounts.

COMPLAINT – Page 12

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and against Defendants as follows:

1. Awarding Plaintiff all damages caused by the acts forming the basis of this Complaint in an amount in excess of $235,534.01;

2. Requiring Defendants to pay to the Plaintiff the costs of this action and the Plaintiff's reasonable attorneys' fees pursuant to the attorney fees provision of the HELOC agreement;

3. Awarding Plaintiff pre-judgment and post-judgment interest on all monetary awards; and

4. Granting Plaintiff such other and further relief as the Court may deem just.

### JURY TRIAL DEMAND

Plaintiff respectfully demands a trial by jury on all claims and issues so triable.

DATED this 11th day of November, 2020.      **THE LEONARD DUBOFF LAW GROUP, PC**

/s/Leonard DuBoff_____
Leonard D. DuBoff, OSB # 774378
lduboff@dubofflaw.com
The DuBoff Law Group, PC
6655 SW Hampton St., Suite 200
Portland, OR 97223-8357
t: 503-968-8111
f: 503-968-7228
Attorney for Plaintiff

COMPLAINT – Page 13

# HOME EQUITY LINE OF CREDIT AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $250,000.00 | 05-19-2007 | 05-19-2017 | 11632330 | | 9402711632330 | 03838 | |

References in the shaded area are for our use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** MARK S MOORE
15960 SW CARDINAL LOOP
BEAVERTON, OR 97007

**Lender:** Discover Bank
502 East Market Street
Greenwood, DE 19950

COPY

**CREDIT LIMIT: $250,000.00**

**DATE OF AGREEMENT: May 19, 2007**

**Introduction.** This Home Equity Line of Credit Agreement ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") issued through Discover Bank. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean Discover Bank. **You agree to the following terms and conditions:**

**Promise to Pay.** You promise to pay Discover Bank, or order, the total of all credit advances and FINANCE CHARGES, together with all costs and expenses for which you are responsible under this Agreement or under the "Deed of Trust" which secures your Credit Line. You will pay your Credit Line according to the payment terms set forth below. **If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.**

**Term.** The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue until May 19, 2017 ("Maturity Date"). All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable upon maturity. The draw period of your Credit Line will begin on a date, after the Opening Date, when the Agreement is accepted by us in the State of Delaware, following the expiration of the right to cancel, the perfection of the Deed of Trust, the receipt of all required certificates of noncancellation, and the meeting of all of our other conditions and will continue as follows: until the Maturity Date. You may obtain credit advances during this period ("Draw Period"). You agree that we may renew or extend the period during which you may obtain credit advances or make payments. You further agree that we may renew or extend your Credit Line Account.

**Minimum Payment.** The minimum payment you must make for each monthly billing period is the amount of the Finance Charges imposed for that billing period, if any, plus any costs and expenses and any past due minimum payments. You agree to pay us the minimum payment each month on or before the date shown in your billing statement, even if you paid more than the minimum in any prior month. You can pay the outstanding balance of your Credit Line in full or in part at any time without penalty. Any payments of your outstanding principal balance will be credited to your Credit Line upon receipt, but will not be available for you to draw against for five (5) calendar days after receipt, unless applicable law provides for a shorter period.

**Balloon Payment.** Your Credit Line Account is payable in full upon maturity in a single balloon payment. You must pay the entire outstanding principal, interest and any other charges then due. **Unless otherwise required by applicable law, we are under no obligation to refinance the balloon payment at that time. You may be required to make payments out of other assets you own or find a lender, which may be us, willing to lend you the money. If you refinance the balloon, you may have to pay some or all of the closing costs normally associated with a new credit line account, even if you obtain refinancing from us.**

**How Your Payments Are Applied.** Unless otherwise agreed or required by applicable law, payments and other credits will be applied first to interest and then to principal.

**Receipt of Payments.** All payments must be made by a check, money order, or other instrument in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement. Payments received at that address prior to 10:00AM CST on any business day will be credited to your Credit Line as of the date received. If we receive payments at other locations, such payments will be credited promptly to your Credit Line, but crediting may be delayed for up to five (5) days after receipt.

**Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of Two Hundred Fifty Thousand & 00/100 Dollars ($250,000.00), which will be your "Credit Limit" under this Agreement. **During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights.** You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. Your Credit Limit is the maximum amount you may have outstanding at any one time. You agree not to attempt, request, or obtain a credit advance that will make your Credit Line Account balance exceed your Credit Limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you. Any credit advances in excess of your Credit Limit will not be secured by the Deed of Trust covering your principal dwelling.

**Charges to your Credit Line.** We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement, the Deed of Trust or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Deed of Trust for this transaction. We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your principal dwelling. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your principal dwelling. If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**Credit Advances.** After the draw period begins, you may obtain credit advances under your Credit Line as follows:

**Credit Line Checks.** Writing a preprinted "Check" that we will supply to you.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one of you telling us not to give advances to the other.

SCANNED
MAY 21 2007

**Limitations on the Use of Checks.** We reserve the right not to honor Checks in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Check.

**Post-dated Checks.** Your Check is post-dated. If a post-dated Check is paid and as a result any other check is returned or not paid, we are not responsible.

**Stolen Checks.** Your Checks have been reported lost or stolen. .

**Unauthorized Signatures.** Your Check is not signed by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Check.

**Transaction Violation.** Your Check is less than the minimum amount required by this Agreement or you are in violation of any other transaction requirement or would be if we paid the Check.

If we pay any Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Check. The Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return Checks along with your periodic billing statements; however, your use of each Check will be reflected on your periodic statement as a credit advance. We do not "certify" Checks drawn on your Credit Line.

**Transaction Requirements.** The following transaction limitations will apply to the use of your Credit Line:

**Credit Line Check Limitations.** The following transaction limitations will apply to your Credit Line and the writing of Checks.

**Minimum Advance Amount.** The minimum amount of any credit advance that can be made on your Credit Line is $100.00. This means any Check must be written for at least the minimum advance amount, and only if the draw complies with the Transaction requirements below.

**Limitation on All Access Devices.** You may not use any access device, whether described above or added in the future, for any illegal or unlawful transaction, and we may decline to authorize any transaction that we believe poses an undue risk of illegality or unlawfulness. Notwithstanding the foregoing, we may collect on any debt arising out of any illegal or unlawful transaction.

**Authorized Signers.** The words "Authorized Signer" on Checks as used in this Agreement mean and include each person who  (a) signs the

Exhibit 1
Page 2 of 8

# HOME EQUITY LINE OF CREDIT AGREEMENT

Loan No: 11632330            (Continued)            Page 2

application for this Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for the Credit Line Account.

**Lost Checks.** If you lose your Checks or if someone is using them without your permission, you agree to let us know immediately. The fastest way to notify us is by calling us at (800) 767-0572. You also can notify us at our address shown at the beginning of this Agreement.

**Future Credit Line Services.** Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**Collateral.** You acknowledge this Agreement is secured by the Collateral described in the following security instrument listed: a Deed of Trust dated May 19, 2007, to a trustee in favor of us on real property located in WASHINGTON County, State of Oregon.

**Insurance.** You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. Subject to applicable law, if you fail to obtain or maintain insurance required in the Deed of Trust, we may purchase insurance to protect our own interest, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things.

**Periodic Statements.** If you have a balance owing on your Credit Line Account or have any account activity, we will send you a periodic statement. It will show, among other things, credit advances, FINANCE CHARGES, other charges, payments made, other credits, your "Previous Balance," and your "New Balance." Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

**When FINANCE CHARGES Begin to Accrue.** Periodic FINANCE CHARGES for credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line. There is no "free ride period" which would allow you to avoid a FINANCE CHARGE on your Credit Line credit advances.

**Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed.** The outstanding balance for each day is determined by taking the ending balance of the previous day (excluding any unpaid periodic FINANCE CHARGES), adding any new credit advances and charges and subtracting any payments and credits posted during the day.

**Method of Determining the Amount of FINANCE CHARGE.** The FINANCE CHARGE for each day is calculated by multiplying the daily Periodic Rate by the outstanding balance for that day, after payments and credits are subtracted and new advances, if any, are added. The total FINANCE CHARGE for the billing period is the sum of the daily finance charges, computed as explained above, for the total number of days in the billing period.

**Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.** We will determine the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE as follows. We start with an independent index which is the Prime rate as scheduled in the <u>Wall Street Journal</u>. When a range of rates has been published, the higher of the rates will be used (the "Index"). The initial rate for the first billing period is shown below. For any subsequent billing cycle, we will use the Index Value on the Closing Date of your billing cycle. The Closing Date of your billing cycle is shown on your billing statement. If your Closing Date is not a business day, the Index Value will be the rate published in the Journal on the next preceding business day. The Index is not necessarily the interest rate charged by us on our loans. If the Index becomes unavailable during the term of this Credit Line Account, we may designate a substitute index, which is beyond our control, after notice to you. To obtain the ANNUAL PERCENTAGE RATE we add a margin to the value of the Index. The ANNUAL PERCENTAGE RATE includes only interest and no other costs. To determine the daily Periodic Rate that will apply, we divide the ANNUAL PERCENTAGE RATE by 365 (366 if a leap year).

The Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line will increase or decrease as the Index increases or decreases from time to time. Any increase in the Periodic Rate will take the form of higher payment amounts. Adjustments to the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE resulting from changes in the Index will take effect monthly. In no event will the corresponding ANNUAL PERCENTAGE RATE be more than the lesser of 18.000% or the maximum rate allowed by applicable law. Today the Index is 8.250% per annum, and therefore the initial ANNUAL PERCENTAGE RATE and the corresponding Periodic Rate on your Credit Line are stated below:

**Current Rates for the First Payment Stream**

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | -0.875 % | 7.375 % | 0.02021 % |

**Current Rates for the Second Payment Stream**

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | -0.875 % | 7.375 % | 0.02021 % |

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.

**Conditions Under Which Other Charges May Be Imposed.** You agree to pay all the other fees and charges related to your Credit Line as set forth below:

Exhibit 1
Page 3 of 8

permitted during any Right of Rescission period.

**Conditions Under Which Other Charges May Be Imposed.** You agree to pay all the other fees and charges related to your Credit Line as set below:

**Annual Fee.** A nonrefundable Annual Fee of $50.00 will be charged to your Credit Line at the following time: On each anniversary effective date of your loan.

**Early Termination Fee.** If you close your account and terminate this Agreement within 3 years of the Opening Date, you must pay an Termination Fee where allowed by law. You acknowledge that we: (i) entered into this Agreement with the expectation that it would r terminated within the initial 3 years following the Opening Date; (ii) would not otherwise have been willing to enter into this Agreeme the terms herein for less than 3 years, and (iii) would not otherwise have incurred expenses and obligations had we known that you terminate this Agreement within 3 years. You acknowledge that we could suffer loss and additional expenses which are difficu impractical to ascertain as a result of termination within 3 years. The Early Termination Fee is a good faith resolution by you and us expense we may incur as a result of early termination. It is not intended as a penalty but as a good faith estimate of such expense amount of this fee is: $350.00.

**Returned Items.** You may be charged $29.00 if you pay your Credit Line obligations with a check, draft, or other item that is disho for any reason, unless applicable law requires a lower charge or prohibits any charge.

**Fee to Stop Payment.** Your Credit Line Account may be charged $15.00 when you request a stop payment on your account.

**Overlimit Charge.** Your Credit Line Account may be charged $29.00 if you cause your Credit Line Account to go over your Credit This includes writing a Check in excess of your available balance.

**Late Charge.** Your payment will be late if it is not received by us within **16 days after the "Payment Due Date"** shown on your pe statement. If your payment is late we may charge you 5.000% of the unpaid amount of the payment or $75.00, whichever is less.

**Security Interest Charges.** You agree to pay on the Opening Day all security interest charges related to your Credit Line as set forth be

| | |
|---|---|
| Flood Determination Fee to Southwest Financial Services | $4.00 |
| Real Estate Evaluation Fee To Market Intelligence | $65.00 |
| Title Examination | $70.00 |
| Total | $139.00 |

**Lender's Rights.** Under this Agreement, we have the following rights:

**Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance i

Exhibit 1
Page 4 of 8

## HOME EQUITY LINE OF CREDIT AGREEMENT

| Loan No: 11632330 | (Continued) | Page 3 |
|---|---|---|

payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement. (3) Your action or inaction adversely affects the Collateral for the plan or our rights in the Collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the Credit Line Account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances.

(3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker. No default will occur until we mail or deliver a notice of default to you, so you can restore your right to credit advances.

(4) We are precluded by government action from imposing the **ANNUAL PERCENTAGE RATE** provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

**Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems). If the Index is no longer available, we will choose a new Index and margin. The new Index will have an historical movement substantially similar to the original Index, and the new Index and margin will result in an **ANNUAL PERCENTAGE RATE** that is substantially similar to the rate in effect at the time the original index becomes unavailable. We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum **ANNUAL PERCENTAGE RATE** under your Credit Line Account is reached.

**Collection Costs.** We may hire or pay someone else to help collect this Agreement if you do not pay. You will pay us that amount. This includes, subject to any limits under applicable law, our attorneys' fees and our legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, you also will pay any court costs, in addition to all other sums provided by law.

**Access Devices.** If your Credit Line is suspended or terminated, you must immediately return to us all Checks and any other access devices. Any use of Checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of Checks or other Credit Line access devices not returned to us.

**Delay in Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

**Cancellation by you.** If you cancel your right to credit advances under this Agreement, you must notify us and return all Checks and any other access devices to us. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement.

**Prepayment.** You may prepay all or any amount owing under this Credit Line at any time without penalty, except we will be entitled to receive all accrued **FINANCE CHARGES**, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Credit Line. You agree not to send us payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Discover Financial Services, 4909 East 26th Street Sioux Falls, SD 57110-6950.

**Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly if you change your mailing address.

**Credit Information and Related Matters.** You authorize us to release information about you to third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law. You agree that, upon our request, you will provide us with a current financial statement, a new credit application, or both, on forms provided by us. You also agree we may obtain credit reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option and expense.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Deed of Trust. Your rights under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for guidance on this subject.

Exhibit 1
Page 5 of 8

**Jury Waiver.  We and you hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either us or you against the other.**

**Governing Law.** This Agreement will be governed by federal law and the law of the State of Delaware. Applicable law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.   If any part of this Agreement becomes unenforceable, it will not make any other part unenforceable.

**Transfer of the Property.** In addition to the protections given to the Lender under this Agreement, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Agreement, protects the Lender from possible losses which might result if Borrower does not keep the promises which Borrower made in this Agreement.   That Security Instrument describes how and under what conditions Borrower may be required to make immediate payment in full of all amounts owed under this Agreement.   Some of those conditions are described as follows: If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a Beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.   However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. If Lender exercises this option, Lender shall give Borrower notice of acceleration.   The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with the "Notices" section of this Security Instrument within which Borrower must pay all sums secured by this Security Instrument.   If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**Notify Lender Of Inaccurate Information Reported To Consumer Reporting Agencies.** I will notify Lender if Lender reports inaccurate information about my account(s) to a consumer reporting agency.  My written notices describing the specific inaccuracy(ies) should be sent to Lender at the following address:  Discover Financial Services, P.O. Box 5079, Sioux Falls, SD  57117-5079.

**ANNUAL PERCENTAGE RATE Maximum.** Notwithstanding any other provision in this agreement, the maximum **ANNUAL PERCENTAGE RATE** during the first 60 months will be the lesser of 1.50% over the **ANNUAL PERCENTAGE RATE** stated on page 2 of this Agreement or the

Exhibit 1
Page 6 of 8

# HOME EQUITY LINE OF CREDIT AGREEMENT

Loan No: 11632330
(Continued)
Page 4

maximum rate allowed by applicable law. Beginning with the 61st month, the maximum **ANNUAL PERCENTAGE RATE** will be the lesser of 18% or the maximum rate allowed by applicable law.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Interpretation.** You agree that this Agreement, together with the Deed of Trust, is the best evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Deed of Trust or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "What you should know about Home Equity Lines of Credit," given with the application.

BORROWER:

MARK S MOORE

Exhibit 1
Page 7 of 8

# HOME EQUITY LINE OF CREDIT AGREEMENT
**Loan No: 11632330**          (Continued)          **Page 5**

---

## BILLING ERROR RIGHTS

### YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at

> Discover Financial Services
> P.O. Box 5079
> Sioux Falls, SD  57117-5079

or at the address listed on your bill.  Write to us as soon as possible.  We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared.  You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

> Your name and account number.

The dollar amount of the suspected error.

Describe the error and explain, if you can, why you believe there is an error.  If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong.  To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then.  Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent.  We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit.  You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount.  If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount.  In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent.  However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill.  And, we must tell you the name of anyone we reported you to.  We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

---

LASER PRO Lending, Ver. 5.36.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2007.   All Rights Reserved.   - OR\DE  T:\CFI\LPL\D25.FC  TR-11632330  PR-DFSRTCAP

Exhibit 1
Page 8 of 8

RECORDATION REQUESTED BY:
Discover Bank
502 East Market Street
Greenwood, DE  19950

WHEN RECORDED MAIL TO:
Discover Bank
Consumer Loan Center (P5-PCLC-01-1)
2730 Liberty Avenue
Pittsburgh, PA  15222

SCANNED

MAY 2 1 2007

SEND TAX NOTICES TO:
MARK S MOORE TRUSTEE OF THE MARK S MOORE TRUST
DATED JUNE 13 1994
15960 SW CARDINAL LOOP
BEAVERTON, OR  97007

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY

## LINE OF CREDIT INSTRUMENT

LINE OF CREDIT DEED OF TRUST.  (A)  This Deed of Trust is a LINE OF CREDIT INSTRUMENT.  (B)  The maximum principal amount to be advanced pursuant to the Credit Agreement is $250,000.00.  (C)  The term of the Credit Agreement commences on the date of this Deed of Trust and ends on May 19, 2017.

THIS DEED OF TRUST is dated May 19, 2007, among MARK S MOORE TRUSTEE OF THE MARK S MOORE TRUST DATED JUNE 13 1994, whose address is 15960 SW CARDINAL LOOP, BEAVERTON, OR  97007; Single ("Grantor"); Discover Bank, whose address is 502 East Market Street, Greenwood, DE  19950 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and Terrence Hammons - Hammons & Mills , Attorneys, whose address is 115 West 8th, Suite 280, Eugene, OR  97401 (referred to below as "Trustee").

Conveyance and Grant.  For valuable consideration, represented in the Credit Agreement dated May 19, 2007, in the original principal amount of $250,000.00, from Borrower to Lender, Grantor conveys to Trustee for the benefit of Lender as Beneficiary all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in WASHINGTON County, State of Oregon:

See Attached Exhibit A, which is attached to this Deed of Trust and made a part of this Deed of Trust as if fully set forth herein.

The Real Property or its address is commonly known as  15960 SW CARDINAL LOOP, BEAVERTON, OR  97007. The Real Property tax identification number is R2006230.

Revolving Line of Credit.  This Deed of Trust secures the Indebtedness including, without limitation, a revolving line of credit, which obligates Lender to make advances to Borrower so long as Borrower complies with all the terms of the Credit Agreement.  Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not including finance charges on such balance at a fixed or variable rate or sum as provided in the Credit Agreement, any temporary overages, other charges, and any amounts expended or advanced as provided in either the Indebtedness paragraph or this paragraph, shall not exceed the Credit Limit as provided in the Credit Agreement.  It is the intention of Grantor and Lender that this Deed of Trust secures the balance outstanding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in the Credit Agreement and any intermediate balance.

Grantor presently assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property.  In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE  (1)  PAYMENT OF THE INDEBTEDNESS AND  (2)  PERFORMANCE OF EACH OF GRANTOR'S AGREEMENTS AND OBLIGATIONS UNDER THE CREDIT AGREEMENT, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST.  THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

Grantor's Representations and Warranties.  Grantor warrants that:  (a) this Deed of Trust is executed at Borrower's request and not at the request of Lender;  (b) Grantor has the full power, right, and authority to enter into this Deed of Trust and to hypothecate the Property;  (c) the provisions of this Deed of Trust do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor;  (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and  (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

Grantor's Waivers.  Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

Payment and Performance.  Except as otherwise provided in this Deed of Trust, Borrower shall pay to Lender all Indebtedness secured by this Deed of Trust as it becomes due, and Borrower and Grantor shall perform all their respective obligations under the Credit Agreement, this Deed of Trust, and the Related Documents.

Exhibit 2
Page 1 of 13

**Possession and Maintenance of the Property.**  Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.**  Until the occurrence of an Event of Default, Grantor may  (a)  remain in possession and control of the Property;  (b)  use, operate or manage the Property; and  (c)  collect the Rents from the Property.  The following provisions relate to the use of the Property or to other limitations on the Property.  BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON TRANSFERRING FEE TITLE SHOULD INQUIRE ABOUT THE PERSON'S RIGHTS, IF ANY, UNDER CHAPTER 1, OREGON LAWS 2005 (BALLOT MEASURE 37 (2004)).  THIS INSTRUMENT DOES NOT ALLOW USE OF THE PROPERTY DESCRIBED IN THIS INSTRUMENT IN VIOLATION OF APPLICABLE LAND USE LAWS AND REGULATIONS.  BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON ACQUIRING FEE TITLE TO THE PROPERTY SHOULD CHECK WITH THE APPROPRIATE CITY OR COUNTY PLANNING DEPARTMENT TO VERIFY APPROVED USES, TO DETERMINE ANY LIMITS ON LAWSUITS AGAINST FARMING OR FOREST PRACTICES AS DEFINED IN ORS 30.930, AND TO INQUIRE ABOUT THE RIGHTS OF NEIGHBORING PROPERTY OWNERS, IF ANY, UNDER CHAPTER 1, OREGON LAWS 2005 (MEASURE 37 (2004)).

**Duty to Maintain.**  Grantor shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.**  Grantor represents and warrants to Lender that:  (a)  During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property;  (b)  Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing,  (i)  any breach or violation of any

Exhibit 2
Page 2 of 13

**DEED OF TRUST**
**(Continued)**

Loan No: 11632330                                                                                                Page 2

Environmental Laws, (ii) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (iii) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (c) Except as previously disclosed to and acknowledged by Lender in writing, (i) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (ii) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (a) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (b) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Deed of Trust, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**Taxes and Liens.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due, except for the Existing Indebtedness referred to below, and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**Property Damage Insurance.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender, together with such other hazard and liability insurance as Lender may reasonably require. Policies shall be written in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, for the maximum amount of your credit line and the full unpaid principal balance of any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required

Exhibit 2
Page 3 of 13

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Deed of Trust, to the extent compliance with the terms of this Deed of Trust would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Deed of Trust for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**Lender's Expenditures.** If Grantor fails (1) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims, (2) to provide any required insurance on the Property, (3) to make repairs to the Property or to comply with any obligation to maintain

Exhibit 2
Page 4 of 13

## DEED OF TRUST
### (Continued)

an No: 11632330                                                                                                    Page 3

Existing Indebtedness in good standing as required below, then Lender may do so.    If any action or proceeding is commenced that would materially affect Lender's interests in the Property, then Lender on Grantor's behalf may, but is not required to, take any action that Lender believes to be appropriate to protect Lender's interests.  All expenses incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor.  All such expenses will become a part of the Indebtedness and, at Lender's option, will  (1)  be payable on demand;  (2)  be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due during either  (a)  the term of any applicable insurance policy; or  (b)  the remaining term of the Credit Agreement; or  (3)  be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity.  The Property also will secure payment of these amounts.  The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of any default.  Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**Warranty; Defense of Title.**  The following provisions relating to ownership of the Property are a part of this Deed of Trust:

**Title.**  Grantor warrants that:  (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and  (b) Grantor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.**  Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons.  In the event any action or proceeding is commenced that questions Grantor's title or the interest of Trustee or Lender under this Deed of Trust, Grantor shall defend the action at Grantor's expense.  Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.**  Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Promises.**  All promises, agreements, and statements Grantor has made in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature and shall remain in full force and effect until such time as Borrower's Indebtedness is paid in full.

**Existing Indebtedness.**  The following provisions concerning Existing Indebtedness are a part of this Deed of Trust:

**Existing Lien.**  The lien of this Deed of Trust securing the Indebtedness may be secondary and inferior to an existing lien.  Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.**  Grantor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Deed of Trust by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender.  Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**Condemnation.**  The following provisions relating to condemnation proceedings are a part of this Deed of Trust:

**Proceedings.**  If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award.  Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.**  If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property.  The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation.

**Imposition of Taxes, Fees and Charges By Governmental Authorities.**  The following provisions relating to governmental taxes, fees and charges are a part of this Deed of Trust:

**Current Taxes, Fees and Charges.**  Upon request by Lender, Grantor shall execute such documents in addition to this Deed of Trust and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property.  Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Deed of Trust.

**Taxes.**  The following shall constitute taxes to which this section applies:  (a)  a specific tax upon this type of Deed of Trust or upon all or any part of the  Indebtedness secured by this Deed of Trust;  (b)  a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust;  (c)  a tax on this type of Deed of Trust chargeable against the Lender or the holder of the Credit Agreement; and  (d)  a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.**  If any tax to which this section applies is enacted subsequent to the date of this Deed of Trust, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either  (a)  pays the tax before it becomes delinquent, or  (b)  contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**Security Agreement; Financing Statements.**  The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

Exhibit 2
Page 5 of 13

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Personal Property. In addition to recording this Deed of Trust in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Deed of Trust as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**Further Assurances; Attorney-in-Fact.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (a) Borrower's and Grantor's obligations under the Credit Agreement, this Deed of Trust, and the Related Documents, and (b) the liens and security interests created by this Deed of Trust on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name

Exhibit 2
Page 6 of 13

## DEED OF TRUST
### (Continued)

Loan No: 11632330                                                                                          Page 4

of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**Full Performance.** If Borrower pays all the Indebtedness when due, terminates the credit line account, and otherwise performs all the obligations imposed upon Grantor under this Deed of Trust, Lender shall execute and deliver to Trustee a request for full reconveyance and shall execute and deliver to Grantor suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Any reconveyance fee required by law shall be paid by Grantor, if permitted by applicable law.

**Events of Default.** Grantor will be in default under this Deed of Trust if any of the following happen: (1) Grantor commits fraud or makes a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about Borrower's or Grantor's income, assets, liabilities, or any other aspects of Borrower's or Grantor's financial condition. (2) Borrower does not meet the repayment terms of the Credit Agreement. (3) Grantor's action or inaction adversely affects the collateral or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without Lender's permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**Rights and Remedies on Default.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of Grantor's obligations under this Deed of Trust, after Grantor's failure to do so, that decision by Lender will not affect Lender's right to declare Grantor in default and to exercise Lender's remedies.

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Borrower or Grantor to declare the entire Indebtedness immediately due and payable.

**Foreclosure.** With respect to all or any part of the Real Property, the Trustee shall have the right to foreclose by notice and sale, and Lender shall have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law. If this Deed of Trust is foreclosed by judicial foreclosure, Lender will be entitled to a judgment which will provide that if the foreclosure sale proceeds are insufficient to satisfy the judgment, execution may issue for the amount of the unpaid balance of the judgment.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor to take possession of and manage the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (a) pay a reasonable rental for the use of the Property, or (b) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Credit Agreement or available at law or in equity.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least fifteen (15) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waives any and all rights to have the Property marshalled. In exercising its rights and remedies, the Trustee or Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

Exhibit 2
Page 7 of 13

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Credit Agreement rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**Rights of Trustee.** Trustee shall have all of the rights and duties of Lender as set forth in this section.

**Powers and Obligations of Trustee.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust:

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee shall have the power to take the following actions with respect to the Property upon the written request of Lender and Grantor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other party of a pending sale under any other trust deed or lien, or of any action or proceeding in which Grantor, Lender, or Trustee shall be a party, unless the action or proceeding is brought by Trustee.

**Trustee.** Trustee shall meet all qualifications required for Trustee under applicable law. In addition to the rights and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender will have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**Successor Trustee.** Lender, at Lender's option, may from time to time appoint a successor Trustee to any Trustee appointed under this Deed of Trust by an instrument executed and acknowledged by Lender and recorded in the office of the recorder of WASHINGTON County, State of Oregon. The instrument shall contain, in addition to all other matters required by state law, the names of the original Lender, Trustee, and Grantor, the book and page where this Deed of Trust is recorded, and the name and address of the successor trustee, and the instrument shall be executed and acknowledged by Lender or its successors in interest. The successor trustee, without conveyance of the Property, shall succeed to all the title, power, and duties conferred upon the Trustee in

Exhibit 2
Page 8 of 13

# DEED OF TRUST
## (Continued)

Page 5

this Deed of Trust and by applicable law. This procedure for substitution of Trustee shall govern to the exclusion of all other provisions for substitution.

**Notices.** Any notice required to be given under this Deed of Trust, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. All copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust shall be sent to Lender's address, as shown near the beginning of this Deed of Trust. Any person may change his or her address for notices under this Deed of Trust by giving formal written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors. It will be Grantor's responsibility to tell the others of the notice from Lender.

**Governing Law.** This Deed of Trust will be governed by federal law and the law of the jurisdiction where the Property is located. However, federal law and the law of the State of Delaware will govern the interest rate and any fees and charges, including their calculation, that are provided for in the Note. Applicable law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. If any part of this Deed of Trust becomes unenforceable, it will not make any other part unenforceable.

**Transfer of the Property.** As used in this section, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, and "Security Instrument" means this Mortgage, Deed of Trust, or Security Deed, as applicable. If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with the "Notices" section of this Security Instrument within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**Cross-Default Provision.** Grantor's default or breach under any note or agreement in which Lender has an interest shall be a breach under this Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

**Grantor's Obligations to Fulfill Any Lease Obligations..** If this Security Instrument is on a leasehold, Grantor shall comply with all the provisions of the lease. If Grantor acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease.

**Occupancy.** Grantor shall, at all times, occupy the Property and use it only as Grantor's primary residence. However, if Grantor notified Lender during the application process that the Property is to be a second home, then Grantor shall occupy, and shall only use, the Property as Grantor's second home. In either case, Grantor shall keep the Property available for Grantor's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Grantor either to rent the Property or give a management firm or any other person any control over the occupancy or use of the Property.

**Miscellaneous Provisions.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** What is written in this Deed of Trust and in the Related Documents is Grantor's entire agreement with Lender concerning the matters covered by this Deed of Trust. To be effective, any change or amendment to this Deed of Trust must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Deed of Trust shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Grantor signing below is responsible for all obligations in this Deed of Trust.

**No Waiver by Lender.** Grantor understands Lender will not give up any of Lender's rights under this Deed of Trust unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender does agree in writing to give up one of Lender's rights, that does not mean Grantor will not have to comply with the other provisions of this Deed of Trust. Grantor also understands that if Lender does consent to a request, that does not mean that Grantor will not have to get Lender's consent again if the situation happens again. Grantor further understands that just because Lender consents to one or more of Grantor's requests, that does not mean Lender will be required to consent to any of Grantor's future requests. Grantor waives presentment, demand for payment, protest, and notice of dishonor.

**Severability.** If a court finds that any provision of this Deed of Trust is not valid or should not be enforced, that fact by itself will not mean that the rest of this Deed of Trust will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Deed of Trust even if a provision of this Deed of Trust may be found to be invalid or unenforceable.

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Grantor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes

Exhibit 2
Page 9 of 13

**Time is of the Essence.**  Time is of the essence in the performance of this Deed of Trust.

**Waive Jury.  All parties to this Deed of Trust hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**CONDOMINIUM OR PLANNED UNIT DEVELOPMENT.**  If the Property is part of a planned unit development ("PUD") or if the property is part of a condominium project ("Condo"), Grantor and Lender further covenant and agree as follows:

**Additional Property Subject to the Security Instrument.**  The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, and is a part of a PUD or includes a unit in, together with an undivided interest in the common elements of a Condo.

The Property also includes Grantor's interest in the owners/homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD or Condo (the "Owners Association") and the uses, benefits and proceeds of Grantor's interest.

**Obligations.**  Grantor shall perform all of Grantor's obligations under the Constituent Documents.  The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association.  Grantor shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**Property Insurance.**  So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, arthquakes and floods, for which Lender requires insurance, then Grantor's obligation to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.  What Lender requires as a condition of this waiver can change during the term of the loan.

Exhibit 2
Page 10 of 13

**DEED OF TRUST**
**(Continued)**

Loan No: 11632330                                                                                                                Page 6

Grantor shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD or Condominium, any proceeds payable to Grantor are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Grantor.

**Public Liability Insurance.** Grantor shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Grantor in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD or Condo, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

**Lender's Prior Consent.** Grantor shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD or Condo, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain: (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**Remedies.** If Grantor does not pay dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph shall become additional debt of Grantor secured by this Security Instrument. Unless Grantor and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Grantor requesting payment.

**2 - 4 FAMILY.** If the Property is 2-4 unit family residence, Grantor and Lender further covenant and agree as follows:

**Use of Property; Compliance with Law.** Grantor shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Grantor shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**Rent Loss Insurance.** Grantor shall maintain insurance against rent loss in addition to the other hazards for which insurance is required.

**Assignment of Leases.** Upon Lender's request after default, Grantor shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Oregon as to all Indebtedness secured by this Deed of Trust.

**DEFINITIONS.** The following words shall have the following meanings when used in this Deed of Trust:

**Beneficiary.** The word "Beneficiary" means Discover Bank, and its successors and assigns.

**Borrower.** The word "Borrower" means MARK S MOORE and includes all co-signers and co-makers signing the Credit Agreement and all their successors and assigns.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated May 19, 2007, **with credit limit of $250,000.00** from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The maturity date of the Credit Agreement is May 19, 2017.

**Deed of Trust.** The words "Deed of Trust" mean this Line of Credit Instrument among Grantor, Lender, and Trustee, and includes without limitation all assignment and security interest provisions relating to the Personal Property and Rents.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto or intended to protect human health or the environment.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Deed of Trust.

**Grantor.** The word "Grantor" means MARK S MOORE TRUSTEE OF THE MARK S MOORE TRUST DATED JUNE 13 1994.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum, including crude oil and any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Trustee or Lender to enforce Grantor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

Exhibit 2
Page 11 of 13

**Lender.** The word "Lender" means Discover Bank, its successors and assigns. The words "successors or assigns" mean any person or company that acquires any interest in the Credit Agreement.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**Trustee.** The word "Trustee" means Terrence Hammons - Hammons & Mills , Attorneys, whose address is 115 West 8th, Suite 280, Eugene, OR  97401 and any substitute or successor trustees.

Exhibit 2
Page 12 of 13

**DEED OF TRUST**
**(Continued)**

Loan No: 11632330

Page 7

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

X _____
MARK S MOORE TRUSTEE OF THE MARK S MOORE
TRUST DATED JUNE 13 1994

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _Oregon_ )
) SS
COUNTY OF _Washington_ )

On this day before me, the undersigned Notary Public, personally appeared **MARK S MOORE TRUSTEE OF THE MARK S MOORE TRUST DATED JUNE 13 1994, Single,** to me known to be the individual described in and who executed the Deed of Trust, and acknowledged that he or she signed the Deed of Trust as his or her free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this _21st_ day of _May_, _2007_.

By _Gloria E. Mendy_                         Residing at _Beaverton, Oregon_

Notary Public in and for the State of _Oregon_          My commission expires _10/03/2009_

OFFICIAL SEAL
**GLORIA E MENDY**
NOTARY PUBLIC-OREGON
COMMISSION NO. 397194
MY COMMISSION EXPIRES OCTOBER 3, 2009

## REQUEST FOR FULL RECONVEYANCE
(To be used only when obligations have been paid in full)

To: _____, Trustee

The undersigned is the legal owner and holder of all indebtedness secured by this Deed of Trust. All sums secured by this Deed of Trust have been fully paid and satisfied. You are hereby directed, upon payment to you of any sums owing to you under the terms of this Deed of Trust or pursuant to any applicable statute, to cancel the Credit Agreement secured by this Deed of Trust (which is delivered to you together with this Deed of Trust), and to reconvey, without warranty, to the parties designated by the terms of this Deed of Trust, the estate now held by you under this Deed of Trust. Please mail the reconveyance and Related Documents to:

_____

Date: _____          Beneficiary: _____

By: _____

Its: _____

LASER PRO Lending, Ver. 5.36.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2007.  All Rights Reserved.  - OR/IDE T:\CFI\LPL\G01.FC TR-11632330 PR-DFSRTCAP

Exhibit 2
Page 13 of 13

OL 05-89   08/18/17



08/18/17

MARK S MOORE
15960 SW CARDINAL LOOP
BEAVERTON        OR  97007

VERIFICATION OF MORTGAGE

PROPERTY ADDRESS:
15960 SW CARDINAL LOOP
BEAVERTON        OR  97007

| | | | |
|---|---|---|---|
| LOAN NUMBER: | 1008818965 | INTEREST PAID TO DATE: | 04/25/17 |
| LOAN TYPE: | Heloc | NEXT PAYMENT DATE: | 05/25/17 |
| INTEREST RATE: | 3.12500 | ORIGINAL AMOUNT: | 250000.00 |
| TERM OF LOAN: | 120 | PRINCIPAL BALANCE: | 224037.11 |
| CLOSING DATE: | 05/25/07 | MINIMUM PAYMENT: | 225700.61 |
| LIEN POSITION: | Second Mortgage | FIRST PAYMENT DATE: | 07/25/07 |

| TIMES DELINQUENT THIS YEAR | | TIMES DELINQUENT LAST YEAR | |
|---|---|---|---|
| 15-30 DAYS | 0 | 15-30DAYS | 0 |
| 31-60 DAYS | 0 | 31-60DAYS | 0 |
| 61-89 DAYS | 0 | 61-90DAYS | 0 |
| 91+DAYS | 0 | 91+DAYS | 0 |

Days Delinquent excluding Grace days: 70

Specialized Loan Servicing LLC does not report payment history to the credit reporting agencies for the transfer month and two
subsequent months. The servicing of this loan transferred to Specialized Loan Servicing LLC on 06/09/14.

REQUESTING COMPANY
    Mark Moore
    5035796277
    Beaverton,  OR  97007

**PLEASE SEE IMPORTANT DISCLOSURES ON THE FOLLOWING PAGE**

8742 Lucent Blvd, Suite 300, Highlands Ranch, CO 80129
Direct 800-315-4757   Fax 1-720-241-7220

Exhibit 3
Page 1 of 4

CL 05-89   08/18/17

**SPECIALIZED LOAN SERVICING LLC IS REQUIRED BY FEDERAL LAW TO ADVISE YOU THAT THIS COMMUNICATION IS FROM A DEBT COLLECTOR.**

**BANKRUPTCY NOTICE - IF YOU ARE A CUSTOMER IN BANKRUPTCY OR A CUSTOMER WHO HAS RECEIVED A BANKRUPTCY DISCHARGE OF THIS DEBT: PLEASE BE ADVISED THAT THIS NOTICE IS TO INFORM YOU OF THE STATUS OF THE MORTGAGE SECURED BY THE SUBJECT PROPERTY. THIS NOTICE CONSTITUTES NEITHER A DEMAND FOR PAYMENT NOR A NOTICE OF PERSONAL LIABILITY TO ANY RECIPIENT HEREOF, WHO MIGHT HAVE RECEIVED A DISCHARGE OF SUCH DEBT IN ACCORDANCE WITH APPLICABLE BANKRUPTCY LAWS OR WHO MIGHT BE SUBJECT TO THE AUTOMATIC STAY OF SECTION 362 OF THE UNITED STATES BANKRUPTCY CODE. IF YOU RECEIVED A DISCHARGE OF THE DEBT IN BANKRUPTCY, WE ARE AWARE THAT YOU HAVE NO PERSONAL OBLIGATION TO REPAY THE DEBT. WE RETAIN THE RIGHT TO ENFORCE THE LIEN AGAINST THE COLLATERAL PROPERTY, WHICH HAS NOT BEEN DISCHARGED IN YOUR BANKRUPTCY, IF ALLOWED BY LAW AND/OR CONTRACT. IF YOU HAVE QUESTIONS, PLEASE CONTACT US AT 1-800-306-6057.**

Exhibit 3
Page 2 of 4

OL 05-89   08/18/17

Specialized Loan Servicing LLC
8742 Lucent Boulevard
Suite 300
Highlands Ranch, CO  80129

MARK S MOORE
15960 SW CARDINAL LOOP
BEAVERTON          OR  97007

# FAX

Date :08/21/17

Total number of pages :4

To :5035796277"

Company :

Department :

Fax number :5035796277"

From :Tyon Byers

Subject:

Exhibit 3
Page 4 of 4



8742 Lucent Boulevard ▪ Suite 300 ▪ Highlands Ranch, CO 80129       📞 1-800-315-4757
                                                                    📠 1-720-241-7218

August 31, 2017

Mark S Moore                                    RE:  Loan Number: **1008818965**
15960 SW Cardinal Loop
Beaverton, OR 97007

Dear Mark S Moore,

This letter is in response to an internal request received by Specialized Loan Servicing LLC ("SLS") on August 18, 2017 regarding the payment history for the above referenced mortgage account.

This letter is to confirm that all payments sent to SLS from June, 2014 until the maturity date of the balloon payment due in May, 2017 were on time.  Delinquency on this loan did not occur until the loan reached the maturity date in which the balance was due in full.

A copy of our correspondence is also being faxed to (503) 517-8548 and (503) 579-6277, as requested.

If you have any questions regarding this information, please contact the Customer Care Department toll free at 1-800-315-4757, Monday through Friday, 6:00 a.m. until 6:00 p.m. MT.  SLS accepts calls from relay services on behalf of hearing impaired borrowers.

Sincerely,

Matthew, Teller ID# 21612
Customer Care Support
Specialized Loan Servicing LLC

RECEIVED
SEP 15 2017
BY: _____

**SPECIALIZED LOAN SERVICING LLC IS REQUIRED BY FEDERAL LAW TO ADVISE YOU THAT THIS COMMUNICATION IS FROM A DEBT COLLECTOR.**

**BANKRUPTCY NOTICE - IF YOU ARE A CUSTOMER IN BANKRUPTCY OR A CUSTOMER WHO HAS RECEIVED A BANKRUPTCY DISCHARGE OF THIS DEBT: PLEASE BE ADVISED THAT THIS NOTICE IS TO INFORM YOU OF THE STATUS OF THE MORTGAGE SECURED BY THE SUBJECT PROPERTY.  THIS NOTICE CONSTITUTES NEITHER A DEMAND FOR PAYMENT NOR A NOTICE OF PERSONAL LIABILITY TO ANY RECIPIENT HEREOF, WHO MIGHT HAVE RECEIVED A DISCHARGE OF SUCH DEBT IN ACCORDANCE WITH APPLICABLE BANKRUPTCY LAWS OR WHO MIGHT BE SUBJECT TO THE AUTOMATIC STAY OF SECTION 362 OF THE UNITED STATES BANKRUPTCY CODE. IF YOU RECEIVED A DISCHARGE OF THE DEBT IN BANKRUPTCY, WE ARE AWARE THAT YOU HAVE NO PERSONAL OBLIGATION TO REPAY THE DEBT.  WE RETAIN THE RIGHT TO ENFORCE THE LIEN AGAINST THE COLLATERAL PROPERTY, WHICH HAS NOT BEEN DISCHARGED IN YOUR BANKRUPTCY, IF ALLOWED BY LAW AND/OR CONTRACT.  IF YOU HAVE QUESTIONS, PLEASE CONTACT US AT 1-800-306-6057.**

Setting the Standard
www.sls.net

Exhibit 4
Page 1 of 1

HOME EQUITY LINE OF CREDIT PAYOFF STATEMENT
.

Specialized Loan Servicing, LLC
8742 Lucent Blvd. Ste.300 Highlands Ranch, CO 80129


Requested By:                          Loan Number:    1008818965
                                       Issue Date:     08/09/17
MARK S MOORE                           Expiration Date: 09/08/17
15960 SW CARDINAL LOOP                 Orig Loan Date:  05/25/07
BEAVERTON              OR   97007
Fax:000-000-0000                       Credit Limit:    250000.00
      000-000-0000

Mortgagor(s) & Property Address:
MARK S MOORE

15960 SW CARDINAL LOOP

BEAVERTON              OR   97007

This is a daily simple interest revolving line of credit. Figures
are based on information available as of the date of this letter.
The following is the amount to pay to close your line of credit.
These figures expire 09/08/17:


Payoff     Principal Balance                 $       224037.11
Amounts:   Interest Calculated to 09/08/17   $         2996.92
           Escrow Credit Balance             $ -          0.00
           Escrow/Impound Advance Balance    $            0.00
           Late Charge Balance               $            0.00
           Statement Fee                     $            0.00
           Release Preparation Fee           $           13.35
           Deferred Principal                $             .00
           Deferred Interest                 $             .00
           Deferred Unpaid Expenses          $             .00
           Deferred Paid Expenses            $             .00
           Deferred Fees                     $             .00
           Deferred Late Charge              $             .00
           Deferred Escrow                   $             .00
           Optional Insurance                $            0.00
           Recording Fee                     $           41.00
           Unapplied Funds Retained          $            0.00
           Unapplied Funds Netted            $            0.00
Pending    Tax/Ins Disb Calcuated to 09/08/17 $           0.00
           Outstanding Fees/Corp Advances    $           11.35
           Termination Fee                   $            0.00
                                               --------------
           Total Amount Due                  $       227099.73

Paying the amount above on or before the expiration date will

Exhibit 5
Page 1 of 4

close your Home Equity Line of Credit.  You will no longer have access to the funds and your lien will be released.

Should you want to pay down your line of credit to $0.00, but not close it, a lesser amount will be due.  For information on how to pay down your line of credit please call our Customer Care Department at 1-800-315-4SLS(4757) Monday - Friday,6a.m. to 6p.m. (Mountain Time).

Please be advised the payoff amount specified is valid through the stated expiration date or the date the loan is transferred to a new servicer. If you have been notified that Specialized Loan Servicing, LLC intends to transfer your loan, you must ensure SLS receives your payoff prior to the date of transfer, or you must make payoff arrangements with the new servicer.

Your home equity line of credit is an open ended account, draws on your line of credit may increase the unpaid principal balance of your loan; the above figures are subject to final verification upon receipt of payoff funds by SLS. We reserve the right to adjust these figures and refuse any funds that are insufficient to pay the loan in full for any reason including, but not limited to, error in calculation of payoff due, previously dishonored payments, interest rate changes, or additional advances between the date of this payoff statement and receipt of funds unless prohibited by applicable state law, including but not limited to Wisconsin.

Any further advances will increase the total due and the per diem finance charges. You are responsible for all advances honored until the line of credit has been closed.

The validity of this statement is further conditioned upon:
1.  Funds received after the expiration date will accrue interest per diem.
2.  A late charge may be included with payments received more than 15 days after the regular due date.  If payment is received less than 15 days after the regular due date, this amount may be deducted from the payoff.
3.  If the payoff funds are insufficient we will return funds with a new quotation.
4.  PAYOFF FUNDS MUST BE IN THE FORM OF CASHIER'S CHECK OR WIRE TRANSFER (SEE INSTRUCTIONS).
5.  Please include a forwarding address for the borrower. It is important that we have this information for any future correspondence.
6.  New York Properties - Please contact Specialized Loan Servicing for Loan Assignments.

Exhibit 5
Page 2 of 4

```
***************Wiring Instructions**************
             Please Remit Payoff Funds to:


     OVERNIGHT                    SLS WIRING INSTRUCTIONS

Specialized Loan Servicing       Bank Name - Wells Fargo, N.A.
8742 Lucent Blvd. Ste 300        Bank Address - San Francisco,CA
Highlands Ranch, CO 80129        Account Number - 2000042928245
HELOC PAYOFF CENTER              Bank ABA# - 121000248
Account Name - SLS - Payoff Clearing

If you have any questions or would like further assistance,
call 1-800-315-4SLS(4757) Monday - Friday, 6a.m. to 6p.m.
(Mountain Time). TDD Number, 1-800-268-9419 Monday - Friday,
8 a.m. to 5 p.m.(Mountain Time). SLS Payoff Request Fax Number
720-241-7537

SPECIALIZED LOAN SERVICING LLC IS REQUIRED BY FEDERAL LAW TO
ADVISE YOU THAT THIS COMMUNICATION IS FROM A DEBT COLLECTOR.

BANKRUPTCY NOTICE- IF YOU ARE A CUSTOMER IN BANKRUPTCY OR A
CUSTOMER WHO HAS RECEIVED A BANKRUPTCY DISCHARGE OF THIS DEBT:
PLEASE BE ADVISED THAT THIS NOTICE IS TO ADVISE YOU OF THE STATUS
OF YOUR MORTGAGE LOAN. THIS NOTICE CONSTITUTES NEITHER A DEMAND
FOR PAYMENT NOR A NOTICE OF PERSONAL LIABILITY TO ANY RECIPIENT
HEREOF, WHO MIGHT HAVE RECEIVED A DISCHARGE OF SUCH DEBT IN
ACCORDANCE WITH APPLICABLE BANKRUPTCY LAWS OR WHO MIGHT BE
SUBJECT TO THE AUTOMATIC STAY OF SECTION 362 OF THE UNITED STATES
BANKRUPTCY CODE. HOWEVER, IT MAY BE A NOTICE OF POSSIBLE
ENFORCEMENT OF THE LIEN AGAINST THE COLLATERAL PROPERTY, WHICH
HAS NOT BEEN DISCHARGED IN YOUR BANKRUPTCY. IF YOU WOULD LIKE TO
DISCONTINUE THESE STATEMENTS PLEASE CONTACT OUR CUSTOMER CARE
CENTER AT 800-306-6057.

   {{end}}
```

Exhibit 5
Page 3 of 4

Specialized Loan Servicing LLC
8742 Lucent Boulevard
Suite 300
Highlands Ranch, CO  80129


MARK S MOORE
15960 SW CARDINAL LOOP
BEAVERTON,  OR 97007

Exhibit 5
Page 4 of 4

# Wire Transfer Services
**Outgoing Wire Transfer Request**

**WELLS FARGO**

| | |
|---|---|
| Today's Date: | Wells Fargo Reference Number: |
| 11/14/2018 | FW0007167318809420 |
| Banker Name: | Officer/Portfolio Number: |
| THILINI W GEMUNUSIRI | ▮ |

| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 503/579-2902 | 03283 | 0007167 | P6060-011 |

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC"), Indian Financial System Code (IFSC) and the International Bank Account Number ("IBAN").

### Originator's Information

| Originator Name: | | | Street Address: | |
|---|---|---|---|---|
| MARK S MOORE | | | 15960 SW CARDINAL LOOP | |
| Primary ID Type: | Primary ID Description: | | Address Line 2: | |
| DLIC | | | | |
| Primary ID St/Ctry/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: | |
| OR | | | | |
| Secondary ID Type: | Secondary ID Description: | | City: | State: |
| PINV | PIN Validation | | BEAVERTON | OR |
| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: | Country: |
| | | | 97007-8371 | US |
| Account Name: | | | Home Phone: | Business Phone: |
| M.STEVEN MOORE COMPANY,LLC | | | | 503/579-6275 |

### Wire Amount and Source of Funds

| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COiD: |
|---|---|---|---|
| 0007167 | $237,133.74 | | 115 |

### Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| Beneficiary/Recipient Name: | Name/Address Line 1: |
|---|---|
| MCCARTHY   HOLTHUS LLP | OR IOLTA ACCT |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
| ▮ | 319 ELM ST |
| Purpose of Funds: | Name/Address Line 3: |
| | SAN DIEGO CA 921012643 |
| | Beneficiary Phone Number: |
| Additional Instructions: | |
| Mark S Moore   File No OR-18-831532-MED   SSN - 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 | |

### Wire Fees

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.



Page 1 of 4

WTR6603 (9-18 SVP)

Exhibit 6
Page 1 of 2

Wire Transfer Services Outgoing Wire Transfer Request

**Customer Signature**

Originator Name

| MARK S MOORE

Originator Signature

☐ Submit manually          Date:

☐ Signature not required    |11/14/2018



**Thilini Gemunusiri**
Personal Banker
NMLS ID: 1769890

**Murray Hill Branch**
MAC P6144-011
14725 SW TEAL BLVD
BEAVERTON, OR 97007
Tel:  503 579 1902
Fax:  503 579 0916
24 Hour Cust. Service: 800 869 3557

Wells Fargo Bank, N.A.          thiliniw.gemunusiri@wellsfargo.com

## Customer Copy

Exhibit 6
Page 2 of 2